Amor W. Sharp v. Commissioner. Katherine C. Sharp v. Commissioner. Amor W. Sharp & Katherine C. Sharp v. Commissioner.
Amor v. Commissioner
Docket Nos. 37798-37800.
United States Tax Court
1953 Tax Ct. Memo LEXIS 136; 12 T.C.M. (CCH) 977; T.C.M. (RIA) 53299; August 28, 1953
*136 1. Held, it was improper for Columbus Wood Preserving Company, a partnership of which petitioner is a member, to reduce the value of its closing inventory on December 31, 1945, so as to reflect the accrual of a loss thereon by reason of the termination of its war contract with the Government. 2. Status of gains realized by petitioner, individually, determined. Michael Waris, Jr., Esq., and Garrett S. Claypool, *137 Esq., for petitioners. R. G. deQuevedo, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion These proceedings involve deficiencies in income taxes of petitioners, for years and in amounts, as follows: Petitioner
Docket No.
1945
1947
1948
Amor W. Sharp
37798
$59,876.30
$20,348.03
Katherine C. Sharp
37799
7,481.11
457.75
Amor W. Sharp & Katherine C. Sharp
37800
$1,080.86
Petitioners have filed amended petitions in which they claim overpayments for each of the years 1945 through 1948. Several of the issues raised in the petitions have been resolved by the stipulation of facts filed herein. The two questions remaining in dispute are: (1) whether the Columbus Wood Preserving Company was correct in reducing the value of its closing inventory on December 31, 1945, by reason of the termination of a war contract with the Government on August 15, 1945; (2) whether petitioner Amor W. Sharp realized capital gain or ordinary income in 1947 and 1948 from the sale of certain crosoted piling during 1947. Findings of Fact All facts stipulated by the parties are so found and made a part hereof. The petitioners *138 are husband and wife who reside in Columbus, Ohio. Their income tax returns for the years here involved were filed with the collector of internal revenue for the eleventh district of Ohio at Columbus. Amor W. Sharp (hereinafter referred to as petitioner) used the cash receipts and disbursement method in reporting his income in all years pertinent herein. On January 1, 1918, petitioner entered the employ of a company engaged in the wood preserving business. Thereafter, except for the period he served in the army, petitioner worked for that company until July, 1922, during which time he first learned the different technical aspects or processes of wood preservation. In 1922, petitioner and his wife formed a partnership under the trade name of Columbus Wood Preserving Company (hereinafter referred to as Columbus) to engage in the wood preserving business. The partnership was expanded in 1942 to include the petitioner's son, William C. Sharp, and John W. Spain. During the taxable years here involved, the partnership interests in Columbus were as follows: Amor W. Sharp
64.3%
Katherine C. Sharp
21.4%
William C. Sharp
14.3%
From its inception, the business of Columbus *139 consisted of procuring untreated timber products, such as piling and ties, having them treated by subcontracting treating plants under Columbus' own rigid specifications, supervision and inspection, and then shipping them to the end user. The treatment of wood is performed by placing the timber in a large closed retort (some piling is 90 feet long) and then forcing the preservative through the wood under pressure to impregnate thoroughly all of its fibers. This process is highly technical and a number of difficult specifications, depending upon the end use to be made of the materials, must be rigidly followed. The entire process requires an expert knowledge of timber species, treating processes, and the end uses of the material. The specification of treating processes is a critical factor since, if an incorrect method is used, the product will not be suitable for the specific end use for which it was intended. For this reason, it is against the policy of Columbus to deal in wood that has been processed by plants other than those which operate under its own specific instructions. With one exception, it has always handled its own material and controlled treatment and delivery to the *140 final destination. On May 26, 1945, Columbus entered into a written agreement (hereinafter sometimes referred to as the "Agreement") with the Central Procuring Agency of the War Department (hereinafter referred to as the "Government") in which Columbus undertook two distinct contractual obligations: (1) to furnish the Government with 18,050 pieces of untreated piling for $291,212.50; and (2) to have that piling treated according to government specifications and delivered to the Government for $808,567.50. The piling was to be used for marine purposes only, principally for harbor work in constructing piers and docks in the South Pacific. It was entirely different from the type of product sold on the general market. Article 20 of the Agreement entered into between Columbus and the Government dealt with the termination thereof and provided as follows: "20. TERMINATION AT THE OPTION OF THE GOVERNMENT. - (a) The performance of work under this contract may be terminated by the Government in accordance with this Article in whole, or from time to time in part, whenever the Contracting Officer shall determine any such termination is for the best interests of the Government. Termination *141 of work hereunder shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract shall be terminated, and the date upon which such termination shall become effective. If termination of work under this contract is simultaneous with, a part of or in connection with, a general termination (1) of all or substantially all of a group or class of contracts made by the War Department for the same product or for closely related products, or (2) of war contracts at, about the time of, or following, the cessation of the present hostilities, or any major part thereof, such termination shall only be made in accordance with the provisions of this Article, unless the Contracting Officer finds that the Contractor is then in gross or wilful default under this contract. "(b) After receipt of a Notice of Termination and except as otherwise directed by the Contracting Officer, the Contractor shall (1) terminate work under the contract on the date and to the extent specified in the Notice of Termination; (2) place no further orders or subcontracts for materials, services or facilities except as may be necessary for completion *142 of such portions of the work under the contracts as may not be terminated; (3) terminate all orders and subcontracts to the extent that they relate to the performance of any work terminated by the Notice of Termination; (4) assign to the Government, in the manner and to the extent directed by the Contracting Officer, all of the right, title and interest of the Contractor under the orders or subcontracts so terminated; (5) settle all claims arising out of such termination of orders and subcontracts with the approval or ratification of the Contracting Officer to the extent that he may require, which approval or ratification shall be final for all the purposes of this Article; (6) transfer title and deliver to the Government in the manner, to the extent and at the times directed by the Contracting Officer (i) the fabricated or unfabricated parts, work in process, completed work, supplies and other material produced as a part of, or acquired in respect of the performance of the work terminated in the Notice of Termination, and (ii) the plans, drawings, information and other property which, if the contract had been completed, would be required to be furnished to the Government; (7) use *143 his best efforts to sell in the manner, to the extent, at the time, and at the price or prices directed or authorized by the Contracting Officer, any property of the types referred to in the subdivision (6) of this paragraph provided, however, that the Contractor (i) shall not be required to extend credit to any purchaser and (ii) may retain any such property at a price or prices approved by the Contracting Officer; (8) complete performance of such part of the work as shall not have been terminated by the Notice of Termination; and (9) take such action as may be necessary or as the Contracting Officer may direct for protection and preservation of the property, which is in the possession of the Contractor and in which the Government has or may acquire an interest. "(c) The Contractor and the Contracting Officer may agree upon the whole or any part of the amount or amounts to be paid to the Contractor by reason of the total or partial termination of work pursuant to this Article, which amount or amounts may include a reasonable allowance for profit, and the Government shall pay the agreed amount or amounts. Nothing in paragraph (d) of this Article prescribing the amount to be paid *144 to the Contractor in the event of failure of the Contractor and Contracting Officer to agree upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this Article shall be deemed to limit, restrict or otherwise determine or affect the amount or amounts which may be agreed to be paid to the Contractor pursuant to this paragraph (c). "(d) In the event of the failure of the Contractor and Contracting Officer to agree as provided in paragraph (c) upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this Article, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (c), shall pay to the Contractor the following amounts: "(1) For completed articles delivered to and accepted by the Government (or sold or retained as provided in paragraph (b) (7) above) and not theretofore paid for, forthwith a sum equivalent to the aggregate price for such articles computed in accordance with the price or prices specified in the contract; "(2) In respect of the contract work terminated as permitted by this Article, the total (without duplication of any items) of (i) the *145 cost of such work exclusive of any cost attributable to articles paid or to be paid for under paragraph (d) (1) hereof; (ii) the cost of settling and paying claims arising out of the termination of work under subcontracts or orders as provided in paragraph (b) (5) above, exclusive of the amounts paid or payable on account of supplies or materials delivered or services furnished by the subcontractor prior to the effective date of the notice of termination of work under this contract which amounts shall be included in the cost on account of which payment is made under subdivision (i) above; and (iii) a sum equal to 2% of the part of the amount determined under subdivision (i) which represents the cost of articles or materials not processed by the Contractor, plus a sum equal to 8% of the remainder of such amount, but the aggregate of such sums shall not exceed 6% of the whole of the amount determined under subdivision (i), which for the purpose of this subdivision (iii) shall exclude any charges for interest on borrowings; "(3) The reasonable cost of the preservation and protection of property incurred pursuant to paragraph (b) (9) hereof; and any other reasonable cost incidental to *146 termination of work under this contract, including expense incidental to the determination of the amount due to the Contractor as the result of the termination of work under this contract. "The total sum to be paid to the Contractor under subdivisions (1) and (2) of this paragraph (d) shall not exceed the total contract price reduced by the amount of payments otherwise made and by the contract price of work not terminated. Except for normal spoilage and to the extent that the Government shall have otherwise expressly assumed the risk of loss, there shall be excluded from the amounts payable to the Contractor as provided in paragraph (d) (1) and paragraph (d) (2) (i), all amounts allocable to or payable in respect of property, which is destroyed, lost, stolen or damaged so as to become undeliverable prior to the transfer of title to the Government or to a buyer pursuant to paragraph (b) (7) or prior to the 60th day after delivery to the Government of an inventory covering such property, whichever shall first occur. "(e) The obligation of the Government to make any payments under this Article: (1) shall be subject to deductions in respect of (i) all unliquidated partial or progress *147 payments, payments on account theretofore made to the Contractor and unliquidated advance payments, (ii) any claim which the Government may have against the Contractor in connection with this contract, and (iii) the price agreed upon or the proceeds of sale of any materials, supplies or other things retained by the Contractor or sold, and not otherwise recovered by or credited to the Government, and (2) in the discretion of the Contracting Officer shall be subject to deduction in respect of the amount of any claim of any subcontractor or supplier whose subcontract or order shall have been terminated as provided in paragraph (b) (3) except to the extent that such claim covers (i) property or materials delivered to the Contractor or (ii) services furnished to the Contractor in connection with the production of completed articles under this contract. "(f) In the event that, prior to the determination of the final amount to be paid to the Contractor as in this Article provided, the Contractor shall file with the Contracting Officer a request in writing that an equitable adjustment should be made in the price or prices specified in the contract for the work not terminated by the Notice *148 of Termination, the appropriate fair and reasonable adjustment shall be made in such price or prices. "(g) The Government shall make partial payments and payments on account, from time to time, of the amounts to which the Contractor shall be entitled under this Article, whether determined by agreement or otherwise, whenever in the opinion of the Contracting Officer the aggregate of such payments shall be within the amount to which the Contractor will be entitled hereunder. "(h) For the purposes of paragraphs (d) (2) and (d) (3) hereof, the amounts of the payments to be made by the Government to the Contractor shall be determined in accordance with the Statement of Principles for Determination of Costs upon Termination of Government Fixed Price Supply Contracts approved by the Joint Contract Termination Board, December 31, 1943, as amended by Regulation No. 5 of the Office of Contract Settlement dated 30 September 1944. The Contractor for a period of three years after final settlement under the contract shall make available to the Government at all reasonable times at the office of the Contractor all of its books, records, documents, and other evidence bearing on the costs and expenses *149 of the Contractor under the contract and in respect of the termination of work thereunder." Article 22 of the Agreement provided that the contractor shall place all subcontracts for materials promptly "and shall schedule deliveries thereof so as to enable it to adhere to, but not unreasonably anticipate, the schedule of deliveries or completion date set forth in the contract." Each subcontractor and its subcontractors was required expressly to agree that it would not unreasonably anticipate the schedule of deliveries or completion dates set forth in its subcontracts. After entering into the Agreement Columbus executed subcontracts with suppliers of raw piling and with a number of treating plants for the processing of the piling under the specifications required by the Government. It also set up the best and fastest treating schedule with these plants that was available. By August 15, 1945, when hostilities with Japan ceased, slightly in excess of 14,000 out of 18,050 pieces of piling had been treated and delivered to the Government in accordance with the Agreement. On August 15, 1945, the Government sent Columbus the following telegram: * * *
"Your (contracts) listed below *150 hereby terminated to the extent stated. Immediately stop all work, terminate all subcontracts and place no further orders except as to additional work or material required to complete any unterminated portion of your (contracts), or that you or a subcontractor wish to retain and continue for your own account. Letter and instructions follow. "1. (Contracts) (Numbers) W09-160-eng-2085 "2. Extent of Termination Complete" On August 15, 1945, Columbus sent to 11 of its subcontractors telegrams which read as follows: * * *
"ARMY ORDERS IMMEDIATE TERMINATION CONTRACT 2085. STOP ALL WORK UNTIL FURTHER ADVISED EXCEPT UNLOADING." * * *
On August 16, 1945, the Government modified its termination order of the preceding day by sending Columbus another telegram reading as follows: * * *
"FIRST WIRE QUOTED SENT DISTRICT ENGINEERS INSPECTING GREEN STICK AND SECOND TO ENGINEERS INSPECTING TREATED PILING STOP REFERENCE IS MADE TO ALL CONTRACTS ON OUR INQUIRY AP(MO)-44448-A COLON "QUOTE TOTAL OUTRIGHT CANCELLATION ALL CONTRACTS INQUIRY AP(MO)-44448-A PILING NECESSITATES IMMEDIATE INVENTORY PILING ALL PRODUCERS' YARDS CUT FOR DELIVERY THIS ORDER STOP SHIPMENT ONLY OF PILING *151 ALREADY LOADED OR FOR WHICH CARS HAVE BEEN SPOTTED IS PERMISSIBLE TO TREATING POINTS ALREADY FURNISHED STOP SINCE CONTRACT TERMINATION WIRE DATED 15 AUGUST WAS DISPATCHED IT HAS BEEN DECIDED TO TREAT PILING ACCEPTED FOR SHIPMENT STOP REQUEST QUICKEST POSSIBLE ACTION SUPPLYING US WITH ABOVE INVENTORY AND ONE COVERING FULL RECORD OF QUANTITIES ENROUTE UNQUOTE. "QUOTE REFER ALL PILING CONTRACTS INQUIRY AP(MO)-44448-A STOP ALL DISTRICT ENGINEERS INSPECTING GREEN PILING AT POINTS OF ORIGIN HAVE BEEN WIRED ACCEPT ALL PILING ALREADY LOADED OR LOADS FOR WHICH CARS ALREADY SPOTTED AT TIME TERMINATION CONTRACT WIRE RECEIVED STOP YOU WILL PROCEED WITH TREATED INSPECTION AND SHIPMENT TO DESTINATIONS FURNISHED ON PILING ACCEPTED FOR SHIPMENT TO TREATING PLANTS UNQUOTE "CPA - 5000 "RUFFNER "Chief, Atlanta Branch CPA" On August 17, 1945, Columbus sent letters to its various suppliers of raw piling informing them that the Government had amended its termination order to permit shipment of all piling which had already been loaded or for which cars had been spotted. On August 20, 1945, the Government sent Columbus a "change order" further modifying its original telegram of termination. That *152 "change order" provided in part as follows: * * *
"Instructions - Payment for acceptable completed items will be made at the contract price under the conditions hereinafter outlined. It is therefore believed that in almost no instance will there be any claim filed by a contractor as a result of such termination. You will however, on request to the contracting officer named below, be supplied forms to file claim if you have a claim recognized under the provisions of the Contract Settlement Act of 1944 (Public No. 395, 78th Congress). "The Government's telegram directed that you terminate all subcontracts except such as you and the subcontractor might wish to retain for your own account. If any such subcontractor insists on making claim against you as a result of such termination of such subcontract the contracting officer will, on request, also supply you with appropriate forms for your use in disposing of such subcontract claims. "Completed Items - By Completed Item in the case of Piling is meant a Treated Pile (to conform with contract specification). In a subsequent telegram you were advised that instructions had been issued to the various inspecting District Engineers *153 of treated material) to inspect and ship to final destination all material accepted for shipment to treating plants by the inspectors of the White Pilings with the understanding that you could not otherwise dispose of the completed items without loss. Shipping instructions have already been furnished the inspecting districts to cover this material. "District Engineer offices designated to handle White Piling inspection at points of origin have been instructed to accept for shipment to treating plants designated by the various contracts, only such piling as had been loaded or for which cars had been spotted (not ordered) at the time our wire of 15 August 1945 advising of contract termination (cancellation) was received. It was meant that in the case of White Piling being hauled to treating plants by truck (or methods other than rail) that shipment would be discontinued immediately. Such piling as remained out - but not acceptable for shipment to treating plant because of contract termination - to be disposed of by you or your subcontractor without cost to the Government, or if this is not possible the piling shall be handled in accordance with Section 20, Paragraph (B) (9) of the *154 contract. "Acceptable completed material shipped prior to the effective date of termination and such other completed material as may be accepted by the contracting officer (through the inspecting districts), after the effective date of termination, will be treated for all purposes as items delivered under the contract and will be invoiced in the usual manner. "Submission of Settlement Proposal - If you have no termination claim against the Government or if you wish to waive any termination claim against the Government, please sign and return two of the three copies of the inclosed No-Cost Prime Contract Settlement Agreement which already bears the signature of the contracting officer. The third copy should be retained for your files." * * *
The enclosure referred to immediately above which was entitled "Supplemental Agreement" and recites that it was entered into pursuant to the authority contained in the initial Contract Settlement Act of 1944 contains the following: * * * "ARTICLE 1. The Contractor hereby unconditionally waives any claim against the Government by reason of the termination of the Contract. "ARTICLE 2. The parties agree to, and do hereby, release *155 each other from any and all obligations arising under the Contract or by reason of its termination or under the Act, insofar as it pertains to the Contract, and all rights and liabilities of the parties so arising shall cease forthwith and be forever released except as follows: "(1) All rights and liabilities, if any, of the parties under the Renegotiation Act. "(2) All rights and liabilities of the parties arising under the Contract articles, if any, or otherwise, which relate to reproduction rights, patent infringements, inventions, applications for patent and patents, including rights to assignments, invention reports and licenses, covenants of indemnity against patent risks and bonds for patent indemnity obligations, together with all rights and liabilities under any such bond. "(3) All rights of the Government to take the benefit of any adjustments of royalties under the Royalty Adjustment Act of October 31, 1942 (Public No. 768, 77th Cong.; 35 U.S.C. 89-96) and to take the benefit of agreements reducing or otherwise affecting royalties paid or payable in connection with the performance of the Contract. "(4) All rights and liabilities of the parties *156 under the articles, if any, in the Contract applicable to options (except) options to continue or increase the work under the Contract), covenants not to compete, covenants of indemnity, and agreements with respect to the future care and disposition by the Contractor of Government-owned facilities remaining in his custody. "(5) All rights and liabilities of the parties arising under the Contract articles, if any, or otherwise, concerning defects in, and guarantees or warranties relating to, any completed articles or component parts furnished to the Government by the Contractor or work done by the Contractor pursuant to the Contract. "(6) All rights and liabilities, if any, of the parties under those clauses inserted in the Contract because of the requirements of Acts of Congress and Executive Orders, including, without limitation, any applicable clauses relating to the following topics: labor law, contingent fees, domestic articles, employment of aliens, 'officials not to benefit.' "(7) All rights of the Contractor to payment for completed items as set forth in the notice of Termination above referred to." * * *
Columbus construed the "change order" as requiring it to *157 follow the Government's instructions and dispose of any unused inventory which it had on hand at the time of termination i.e., untreated piling which had not been loaded and for which cars had not been spotted. Columbus considered the proposal of the Government to waive any termination claims it might have but did not enter into the "Supplemental Agreement" above referred to because the partners were uncertain and confused as to how to proceed. They knew that they had large inventories of piling on hand which they were expected to dispose of and they did not know what would result. After Columbus had informed its six suppliers of raw piling of the Government's action, each supplier sent Columbus its invoice for the piling which it had manufactured and stored under a purchase order from Columbus and which had been intended for delivery on the contract. Columbus effected settlements in October 1945, with three of those suppliers, on the basis of approximately ten cents per lineal foot for the piling which was left over. These settlements were not sales on the open market. The market for such piling was glutted at this time and no one was able to dispose of any such material. Columbus *158 was not able to effect settlement with R. S. Allen, Pacific Lumber & Shipping Company and Patrick Lumber Company. The untreated piling which had been manufactured by these producers for Columbus in accordance with its purchase orders and intended for application and use under its Government contract had a cost basis of $73,073. On its return for 1945, Columbus included such piling in its closing inventory at a value of $25,824.94. Columbus kept its books and reported its income on an accrual basis in all pertinent years. In each of the years 1942, 1943, 1944 and 1945, Columbus valued its inventory on the basis of the lower of cost or market, as it had elected to do on its returns. Upon cessation of hostilities with Japan on August 15, 1945, the Government no longer had use for piling here involved, and the market therefore was virtually extinguished. From August 15, 1945, until March 1946, petitioner and his partners exerted all their energies in an attempt to sell such piling. They contacted every possible user in the country of whom they knew who might be interested in using all or any part of that piling at any price. The possible users contacted included port authorities, highway *159 departments, wharf and dock contractors and railroads. To the New York Port Authority, Columbus on September 19, 1945, wrote: * * *
"In winding up our military contracts, we are developing a considerable surplus of 40feet, 50feet, 70feet, 80feet, and 90feet Navy specification piling, which we have been asked to dispose of commercially if at all possible. "This material is all cut, ready for immediate loading, and carries Army inspection certificates. Suggest therefore, that if you have any immediate or future requirements for material of this kind, you get in touch with us by return mail, as in the process of our contract terminations, it becomes necessary for us to make some disposition of the entire lot, within the near future. "Your inquiry therefore, is urgently requested, and we are sure that we will be able to make you an attractive proposal on any requirement you may have to cover." * * *
In reply thereto, Columbus was informed that although the Port Authority had no need for such piling, a certain firm of contracting engineers in New York might be interested in the offer. On September 28, 1945, Columbus wrote such firm as follows: * * *
"A few days *160 ago, we wrote to the City of New York Port Authority, advising them that in cleaning up our military contracts, we have developed a surplus of several thousand sticks of 40feet to 90feet Yellow Pine and Douglas Fir Piling, which we are trying to dispose of for the Army. "We now are in receipt of a reply from James Clark McGuire, Director of Purchase and Special Services, copy attached herewith, in which they suggest that we bring this matter to your attention. "If you have any immediate piling requirements of any description, we would appreciate very much hearing from you by return mail, as no doubt we will be able to make you a proposal which will be mutually beneficial. "Your prompt reply will be much appreciated." * * *
This firm replied that it had no immediate piling requirements, but requested a listing of quantities and lengths together with certain f.o.b. prices. The first offer for any piling received by Columbus after August 15, 1945, was on March 12, 1946, for a small amount of piling at nine cents per lineal foot. The value of $25,824.94 which Columbus placed upon its closing inventory in its 1945 return was arrived at by using a figure of approximately 10 *161 cents per lineal foot. That was the price per lineal foot used in the settlements with several of its suppliers. Columbus was uncertain throughout the period between August 15 and December 31, 1945, as to its rights and obligations arising from the termination of the Agreement. It did not know the correct or ultimate disposition to be made of the inventory in question. The Government had instructed Columbus to dispose of its inventory as best it could with no cost to the Government. On the other hand, the series of modifications of the initial termination order caused Columbus to believe that the Government might order loading and treatment of all piling which had been cut for use under the Agreement and was then on hand at loading points. In September 1945, a representative of the Contract Termination Branch of the Government came to Columbus to discuss the possibilities of arriving at a settlement. This representative recognized the difficulties of deciding what should properly be done with the inventory. Columbus requested that he give it instructions or suggestions for the disposal of the inventory. He did not do so. At the end of the year, neither the petitioner nor his partners *162 had any idea as to what sort of settlement would be arrived at. They were confused and did not know what to do. They were trying to do the best they could but were getting no results. As a possible means of getting rid of the large inventory of untreated piling on the West Coast, they considered ordering shipment back to the Middle West. The heavy transportation costs, plus the large cost of storing the piling when transported, coupled with rumors that there might be some outlet for the piling on the West Coast, caused them to abandon the idea. These rumors never materialized and by the end of December 1945, petitioner and his partners were convinced that the possibility of disposing of such inventory was very remote and that they would sustain a loss thereon. On March 21, 1946, Columbus and the Government entered into a no-cost settlement agreement which provided, in part, as follows: "ARTICLE 1. The contractor hereby unconditionally waives any claim against the Government by reason of the termination of the Contract. "ARTICLE 2. (1) The Contractor hereby transfers and assigns to the Government all of its right, title and interest in and to its subcontracts Nos. 1768K, 1768L *163 and 1768M (hereinafter in this Article called 'the Subcontracts') with W. T. Ferguson Lumber Company, St. Louis, Missouri, Pacific Lumber & Shipping Company, Seattle, Washington, and Patrick Lumber Company, Portland, Oregon, respectively, (hereafter in this Article called 'the Subcontractors'), insofar as such subcontracts are allocable to the terminated portion of the prime contract. "(2) The Government hereby accepts the transfer and assignment of all of the Contractor's right, title and interest in and to the Subcontracts, and assumes and undertakes to settle with and pay to the Subcontractors such amounts as may be found to be due them by reason of the termination of the Subcontracts, insofar as such amounts are allocable to the terminated portion of the prime contract and are not in excess of the amounts specified in paragraph (6). "(3) The Contractor hereby releases the Government from any obligation which the Government now has or may have to reimburse the Contractor for any sums which the Contractor might be required to pay to the Subcontractors by reason of the termination of the Subcontracts. "(4) The Government hereby releases the Contractor from all obligation to *164 negotiate and settle with and pay to the Subcontractors the amounts which are or will be due to the Subcontractors by reason of the termination of the Subcontracts, insofar as such amounts are allocable to the terminated portion of the prime contract. The Government further agrees to hold the Contractor harmless in the event that any litigation arises in connection with such obligation, subject to the provisions of paragraphs (5) and (6) hereof. "(5) In the event that the Subcontractors institute litigation against the Contractor in connection with any obligation referred to herein, the Contractor agrees promptly to notify the Government of such action and to defend such litigation or, if the Government so requests, to permit the Government to assume the defense of such litigation. The failure of the Contractor to comply with the provisions of this paragraph shall relieve the Government from all liability under this Agreement, or otherwise, to pay any claim arising in connection with any of such obligations. "(6) In no event shall the aggregate amount to be paid to the Subcontractors by the Government under this Article exceed $25,000.00. "ARTICLE 3. The parties agree to, and *165 do hereby, release each other from any and all obligations arising under the Contract or by reason of its termination or under the Act, in so far as it pertains to the Contract, and all rights and liabilities of the parties so arising shall cease forthwith and be forever released except as follows: "(1) All rights and liabilities, if any, of the parties under the Renegotiation Act. "(2) All rights and liabilities of the parties under the articles, if any, of the Contract which relate to reproduction rights, patent infringements, inventions, applications for patent and patents, including rights to assignments, invention reports and licenses, covenants of indemnity against patent risks and bonds for patent indemnity obligations, together with all rights and liabilities under any such bond. "(3) All rights of the Government to take the benefit of any adjustment of royalties under the Royalty Adjustment Act of October 31, 1942 (Public No. 768, 77th Cong.; 35 U.S.C. 89-96) and to take the benefit of agreements reducing or otherwise affecting royalties paid or payable in connection with the performance of the Contract. "(4) All rights and liabilities of the *166 parties arising under the contract articles, if any, or otherwise, concerning defects in, and guarantees or warranties relating to, any completed articles or component parts furnished to the Government by the Contractor or work done by the Contractor pursuant to the Contract. "(5) All rights and liabilities, if any, of the parties under those clauses inserted in the Contract because of the requirements of Acts of Congress and Executive Orders, including, without limitation, any applicable clauses relating to the following topics; labor law, contingent fees, domestic articles, employment of aliens, 'officials not to benefit'. "(6) The right of the Contractor to prosecute an appeal or appeals from the decision of the Contracting Officer under the provisions of the Contract or to take any other action which to him may appear necessary and proper to enforce and collect a claim for demurrage in the amount of $435.60 pending at the time of termination." On its income tax return for 1946, Columbus included in income the amount of $47,248.06 which was equivalent to the amount by which its closing inventory for 1945 had been written down. On November 7, 1947, Columbus and the Government *167 entered into a further settlement agreement relating to a claim for demurrage in the amount of $404.08. This claim arose from the Agreement and its settlement represented the final disposition of the Agreement. In August 1946 petitioner Sharp was informed by a government official that War Assets Administration (hereinafter sometimes called War Assets) wanted to sell a quantity of surplus treated piling. He was not interested in the proposition at the time because the business of Columbus did not include dealing in piling which had not been treated under its own specifications and directions and it never had handled such piling. Nevertheless, petitioner requested a list of the piling and after studying it concluded that it might be safe to offer it to a power company for use as transmission poles because such poles do not have to be as strong as piling. At the same time, the petitioner decided that he would engage in the transaction in surplus piling as an individual, keeping the partnership out of the matter. In November 1946, and January and February 1947, the petitioner and Columbus purchased treated piling from the War Assets Administration at a cost of 34 cents per lineal foot. *168 The cost to War Assets to produce that piling was about $1.50 per lineal foot, transportation costs alone amounting to about 50 cents per lineal foot. The contract of purchase with the War Assets Administration dated November 7, 1946, was entered into by petitioner individually. Petitioner individually made payment thereunder on December 28, 1946. The purchase contracts with the War Assets Administration of January 31, 1947, and February 25, 1947, were entered into by the partnership, Columbus. Payment thereof was made by petitioner individually on September 11, 1947. All sales of the treated piling thus acquired were made by the petitioner individually. In his effort to dispose of the treated piling purchased by him individually pursuant to the contract of November 7, 1946, petitioner personally sought out and made contact with several users. A friend who was in the electric power business and who knew petitioner had the piling to dispose of informed him that the Ohio-Midland Light and Power Company (herinafter called Ohio-Midland) might be able to use the piling as transmission poles. The petitioner then personally contacted Ohio-Midland and on December 23, 1946, entered into a *169 contract of sale whereby that company purchased the surplus piling from him for use as transmission poles. Only one sale was made by petitioner to Ohio-Midland. That sale was covered by seven invoices, a separate invoice being issued to show the quantity in each carload shipped. Neither petitioner nor Columbus ever had any prior or subsequent dealings with Ohio-Midland. Payment was made by Ohio-Midland to petitioner individually on January 24, 1947, and the amount received was deposited by him in his personal bank account. In January, 1947, the petitioner was again informed by the same government official that War Assets had two more lots of surplus piling stored at Wikes-Barre and Susquehanna, Pennsylvania, which it wanted to sell. Petitioner requested that a list of such piling be sent to him. While the petitioner was examining that list, the partnership received an inquiry from a state contractor as to whether it could supply a large amount of piling to build a big bridge at St. Joseph, Michigan. The piling lengths needed corresponded to those which War Assets wanted to sell and, although the partnership still had some misgivings as to whether it should handle such "second hand" *170 material - i.e., that which had not been treated under its specifications and supervision, it was encouraged by the petitioner's successful transaction with Ohio-Midland and decided to try to make a deal with the contractor for the surplus piling. The partnership entered into contracts of purchase with War Assets on January 31, and February 25, 1947, covering the piling located at the two points in Pennsylvania. This represented one purchase of two lots. It then entered into an agreement with the contractor and ordered shipment of the piling to Michigan from the Pennsylvania storage points. When the Michigan contractor tried to drive the pilings into the foundation, the blows of the steam hammer caused them to shatter and disintegrate. Other pilings were tried and the same thing happened. The Michigan State Highway Department therefore ordered the contractor to have them taken off the job and replaced by material which could stand driving. Examination revealed that the defective piling either had been treated improperly or subjected to excessive temperatures. Most of the rejected piling was already in transit by rail at the time it was found to be defective. Demurrage charges were *171 beginning to mount. The railroad company was asked to stop the cars at the first junction point and the War Assets Administration was wired to stop all loading. Since it had been at petitioner's insistence that the partnership had entered into the deal to handle the surplus piling, he felt responsible for the situation. He offered individually to take the surplus piling over from the partnership and salvage what he could from it. He thereupon took over the entire deal on his own responsibility. Petitioner canvassed the various possibilities of getting the piling off the railroad cars. The only solution he could find was the agreement of a power company which had a pole storage yard at Somerset, Ohio, to allow him to ship the pilings to their yard and store them at his expense until such time as he could dispose of them. Petitioner had the cars of unsatisfactory material loaded and sent from St. Joseph and the other cars diverted to Somerset where it was placed in t8e storage yard. The Pennsylvania Power and Light Company (hereinafter called Pennsylvania) of Hazletown, Pennsylvania, had learned that Columbus had bought the surplus piling stored at Wilkes-Barre, and requested the *172 partnership to sell it such piling. Petitioner informed Pennsylvania that the partnership had retired from the deal, but that he individually would be glad to make the sale. On April 7, 1947, the petitioner individually entered into a contract of sale with Pennsylvania for practically all of the surplus piling located at Wilkes-Barre for use as transmission poles. The petitioner individually received the sales price of $15,033.04, on June 30, 1947, and deposited such proceeds in his personal bank account. Only one sale was made by the petitioner to Pennsylvania. That sale was covered by 11 invoices, a separate invoice being issued to show the quantity in each carload shipped. Neither petitioner nor Columbus ever had any prior or subsequent dealings with Pennsylvania. Belmont Rural Electric Company (hereinafter called Belmont), having reconsidered petitioner's earlier suggestion that it might be able to use surplus piling as transmission poles, entered into a contract with petitioner individually on April 16, 1947, to purchase a quantity of surplus piling at a price of $5,960.72. Petitioner individually received the proceeds from that sale on September 26, 1947, and deposited them *173 in his personal bank account. Only one sale was made to Belmont, which sale was covered by four invoices representing the number of carloads shipped. Petitioner never had any prior or subsequent dealings with Belmont and Columbus had never sold Belmont any transmission poles. In April, 1947, Columbus had taken an order from the state of West Virginia for 150 pieces of treated piling. Part of that order called for pilings 60 feet in length - a size which Columbus at that time had difficulty in locating. The petitioner decided to sell Columbus the best pieces of surplus piling for use on the West Virginia job despite the bad experience on the Michigan job. He did this because the foundation on the West Virginia job differed from that in Michigan in that it was soft and mucky and it was felt that by careful selection of the best pieces the surplus piling would be satisfactory as piling on this particular job. On April 23, 1947, petitioner sold Columbus 96 pieces of surplus piling. That sale was evidenced by a single invoice. Payment was made to the petitioner on June 30, 1947, by crediting his personal withdrawal account on the books of the partnership in the amount of $5,241.60. *174 Except for one small order the Michigan deal in March 1947 represented the first substantial sale of piling after the cessation of hostilities in August 1945. The West Virginia transaction was the second. These sales represented the beginning of the revival of the market for piling. After South Central Rural Electric Company (hereinafter called South Central) had unloaded and stored in its yard at Somerset the first distress shipment of surplus piling transferred from the Michigan job, it decided that material could be used as poles in the construction of a transmission line it contemplated building the following Fall. On May 5, 1947, the petitioner individually sold South Central the remainder of the surplus piling to be used by it as transmission poles. The total selling price of the piling was $27,948.22. Petitioner personally received $9,870.73 thereof on October 15, 1947. The remaining $18,077.49 of the sales price was received by petitioner in February and June of 1948. Only one sale was made to South Central and all of the proceeds therefrom were deposited in petitioner's personal bank account. This one sale was covered by 14 invoices representing the number of carloads shipped. *175 Petitioner never had any prior or subsequent dealings with South Central and Columbus has never sold South Central any transmission poles. The sale price received by petitioner, the costs incurred by him, and the resulting gain derived by petitioner individually from the foregoing, follow: SALES OF PROPERTY ACQUIRED FROM
WAR ASSETS ADMINISTRATION
DEDUCTIONS
SALES
CONTRACT
OTHER
PURCHASER
PRICE
COST
COSTS
TOTAL
GAIN
YEAR 1947
Ohio-Midland Light & Power Com-
pany
$13,757.70
$ 7,344.00
$ 488.00
$ 7,832.00
$ 5,925.70
South Central R.E.C., Inc
9,870.73
4,911.30
1,950.00
6,861.30
$3,009.43
Less portion of sales price and
cost deferred pending settlement
of disputed cost with War Assets
Administration
4,432.57
2,205.48
875.67
3,081.15
1,351.42
$ 5,438.16
$ 2,705.82
$1,074.33
$ 3,780.15
$ 1,658.01
Belmont Electric Co-op
5,960.72
2,801.60
0
2,801.60
3,159.12
Pennsylvania Power & Light Co.
$15,033.04
$12,501.80 $0
$12,501.80
$2,531.24
Less portion of sales price and
cost deferred pending settlement
of disputed cost with War Assets
Administration
5,588.52
4,647.53
0
4,647.53
940.99
$ 9,444.52
$ 7,854.27 $0
$ 7,854.27
$ 1,590.25
Columbus Wood Preserving Com-
pany
5,241.60
2,094.40
0
2,094.40
3,147.20
TOTAL YEAR 1947
$39,842.70
$22,800.09
$1,562.33
$24,362.42
$15,480.28
YEAR 1948
South Central R.E.C., Inc.
18,077.49
7,690.80
2,294.00
9,984.80
8,092.69
$57,920.19
$30,490.89
$3,856.33
$34,347.22
$23,572.97
Proportionate share of sales price and expenses deferred -
based upon percentage relationship of disputed cost to contract price: South Central R.E.C., Inc.
$ 4,432.57
$ 2,205.48
$ 875.67
$ 3,081.15
$1,351.42
Pennsylvania Power & Light
Co.
5,588.52
4,647.53
0
4,647.53
940.99
$10,021.09
$ 6,853.01
$ 875.67
$ 7,728.68
2,292.41
$67,941.28
$37,343.90
$4,732.00
$42,075.90
$25,865.38
*176 The following is a breakdown of the "other costs" referred to above in connection with petitioner's sales to Ohio-Midland and South Central: 12/30/46
Darwin Kindler
$ 288.00
1/29/47
Darwin Kindler
100.00
1/30/47
Darwin Kindler
100.00
6/11/47
Darwin Kindler
150.00
5/24/47
Allen G. Thurman
500.00
6/12/47
Darwin Kindler
200.00
10/18/47
Darwin Kindler
600.00
12/ 3/47
Allen G. Thurman
500.00
12/31/47
Darwin Kindler
100.00
1/21/48
Darwin Kindler
300.00
4/ 8/48
Darwin Kindler
200.00
4/28/48
Ervin & Ervin, Attys.
120.00
5/20/48
Allen G. Thurman
500.00
6/16/48
Darwin Kindler
1,065.00
6/30/48
Darwin Kindler
9.00
TOTAL
$4,732.00
The foregoing series of payments to Kindler represents finder's fees paid by petitioner in connection with the Ohio-Midland transaction. Petitioner had no previous arrangement with regard thereto. After sale was completed, petitioner paid Kindler what petitioner thought the services rendered by him were worth. Kindler himself conducted no negotiations. His services, in addition to calling petitioner's attention to the possibility of making the sale to Ohio-Midland, included helping petitioner unload *177 and store the surplus piling shipped from Michigan. The foregoing payments were made to Thurman for certain services rendered by him in connection with servicing the contract and the settlement of the difficulties which arose with respect to the Michigan matter and the sale to Pennsylvania. He did not locate any purchasers for petitioner. There was no prearrangement as to the amount of such payments, petitioner paying what he thought the services were worth. All such payments were charged against the South Central contract. Respondent held that Columbus erred in reducing the value of its inventory and that A. W. Sharp received ordinary and not capital gain for the years 1946 and 1947 in his personal dealings in pilings. Opinion VAN FOSSAN, Judge: Under its agreement with the Government, Columbus was called upon to furnish a quantity of treated piling to be used in constructing wharves and piers in the South Pacific. Columbus was not a producer of raw piling. Nor did it operate its own plant for the treatment thereof. It let subcontracts to producers who could supply it under the prime contract, and to operators of treatment plants for the treating, under its strict supervision, *178 of the raw materials so supplied. Hostilities with Japan having ended, the Government on August 15, 1945, notified Columbus to cease all work under its agreement and to terminate all subcontracts relating thereto. Following such termination, Columbus was able to effect settlements of the claims of all but three of its subcontractors. The invoices received by Columbus from these three with whom it could not reach agreement, covering the raw piling manufactured and stored by them for Columbus in accordance with its purchase orders and intended for application and use under its prime contract, totalled $73,073. The parties have stipulated that this latter amount was the cost basis of such property. On its 1945 return, Columbus accrued this amount as an expense and included it in cost of goods sold. However, taking the view that the market value of the raw piling involved had declined since the war had ended, Columbus wrote down the value thereof in its closing inventory to $25,824.94. Respondent has determined and here takes the position that Columbus erred in so reducing the value of its inventory Petitioner and his wife not only defend the propriety of Columbus' action, but, by amended *179 pleadings, now seek to reduce the value of the piling inventory on December 31, 1945 to zero. The issue thus framed turns on the proper interpretation to be placed upon the Agreement involved with respect to the rights and obligations of Columbus thereunder. Particular attention is to be given to Article 20 thereof, which article deals with the rights and obligations of both parties in the event of the termination of the Agreement at the option of the Government. This article has been fully set forth above in our findings. In support of his position, respondent first argues that under the provisions of the Agreement, all right, title and interest in the subcontracts and materials acquired thereunder passed to the Government upon termination thereof; and that, since the Agreement had been terminated on August 15, 1945, Columbus, thereafter, could not properly accrue any amount with respect thereto as an expense nor include any such amount in its inventory. This contention is based upon the provisions of Article 20 (b) (4) and (6) of the Agreement. Respondent urges that Columbus' efforts to sell the material involved were not exerted on its own behalf but were merely attempts to *180 dispose of such material for the Government as it was required to do under Article 20 (b) (7) of the Agreement. In the connection, respondent points to the two letters, set out above, which were written to prospective buyers. In one such letter Columbus described the material for sale as that "* * * which we have been asked to dispose of commercially if at all possible * * *" and in the other as that "* * * which we are trying to dispose of for the Army." We cannot subscribe to respondent's construction of the contractual provision in question. There is no provision, that upon termination of the Agreement, all the right, title and interest of Columbus thereunder in and to the material acquired pursuant thereto was automatically assigned and transferred to the Government. Rather, in such event, Columbus only became obligated to make such assignment and transfer. There is a distinct difference between the obligation so to perform and the actual performance thereof. The Agreement provides for the actual assignment to be made and the transfer of title and delivery to be effected in the manner, to the extent, and at times directed by the Contracting Officer for the Government. Thus, it *181 seems clear that, until Columbus received direction to such effect, all right, title and interest in and to the piling involved, was to remain in it. There is no evidence that any directions of this nature were received by Columbus in 1945. Certainly the series of orders culminating in that of August 20, 1945, cannot be said to have constituted such. This last order, as we read it, was in substance merely a direction to Columbus to dispose of as much of the piling as possible on its own initiative and without cost to the Government, and to preserve, pursuant to Article 20 (b) (9) of the Agreement, any that it was unable thus to sell pending further negotiations as a result of which the Government might acquire an interest therein. Such direction was apparently an effort on the part of the Government to minimize possible future losses and to prevent the acquiring of more material than was absolutely necessary. In any event, and regardless of the wording used by Columbus in its letters to possible purchasers, or what in fact, may have been its thinking, we are firmly of the opinion that title to all interest in the piling was not effectively passed to the Government at any time during *182 1945. Furthermore, if Columbus' liability to pay a reasonably ascertainable amount for the piling was or became fixed in 1945, such amount was properly accruable in that year as an expense and the property includible in its inventory. Boston Elevated Railway Co., 16 T.C. 1084, affd. 196 Fed. (2d) 923; Apex Electrical Manufacturing Co., 16 T.C. 1171. Petitioner has introduced evidence tending to show such fixed liability and the amount thereof, which amount agrees with that stipulated as the cost basis of the material in question. Respondent has not gone forward with any countervailing evidence. Thus, it appears that Columbus acted properly in accruing such amount and including it in its inventory. We do not feel, however, that Columbus was justified in accruing a deductible loss thereon immediately thereafter, through a devaluation of its inventory. Unlike the situation present in both U.S. Cartridge Co. v. United States, 284 U.S. 511 and American Propeller & Manufacturing Co. v. United States, 14 Fed. Supp. 168, reversed in part on other grounds, 300 U.S. 475, the Agreement here involved gave *183 Columbus the assurance of some measure of compensation or reimbursement, which fact is to be considered in valuing its inventory for tax purposes. See Reg. 111, sec. 29.42-1, Mim. 5897, 1945 C.B. 131. Nor was this contractual right superseded by Columbus' compliance with the Government's order to attempt to dispose of the inventory without cost to it. Compliance therewith by Columbus did not affect its fixed contractual right to be compensated or reimbursed for any of such inventory, which it was unable to dispose of, and which, in accordance with the order received, it was to preserve pursuant to Section 20 (b) (9) of the Agreement. Petitioners cite Luckenback Steamship Co., 9 T.C. 662 and Henry Hess Co., 16 T.C. 1363. Both cases involved a determination of the proper year in which to accrue and tax gains arising from compensation paid the taxpayers by the War Shipping Administration for the loss by sinking of certain vessels requisitioned by it for use in connection with the late war. We held in each case that no gain was properly accruable or taxable *184 until some event had occurred fixing with reasonable certainty the amount thereof. Such rationale, is applicable here in determining the proper time for the accrual and deduction of a loss. Cf. Apex Electrical Manufacturing Co., supra.Cf. also Regulations 111, Section 29.23 (e)-1. Here, the amount of recoupment to which Columbus was entitled under its Agreement did not become fixed at any time in 1945, being dependent upon the particular provision in the Agreement under which a final settlement might ultimately be effected. The Government, by reason of its termination of the Agreement, was obligated to pay Columbus either an amount agreed upon between the parties which amount could include a reasonable amount for profit, as provided in Article 20 (c) thereof, or, in case no such agreement could be reached, a sum computed in accordance with a formula provided in Article 20 (d). True it is that the Government's obligation to make any payment of the amount so computed, was subject, in the discretion of the Contracting Officer, to "* * * deduction in respect of the amount of any Claim of any subcontractor or supplier whose subcontract or order shall have been terminated *185 * * *" as here was done. But, it is to no avail that petitioner argues that because of such provision, Columbus was guaranteed nothing. A reasonable interpretation of the provision in question is that, in the event of such a deduction, Columbus would, at the same time, be relieved of its obligation on the claim for which the deduction was made. In fact, application of this provision would seem to result in a no-cost settlement, such as the one eventually effected here. Thus, whether Columbus was to be compensated by the payment of cash or reimbursed by being relieved of its obligations to its subcontractors, the fact of the Government's liability was fixed and Columbus was assured against total loss. Only the amount thereof was, at the end of 1945, not reasonably ascertainable, being dependent upon an event which did not take place in that year. This being true, it was impossible for Columbus to know in that year whether it would eventually realize a profit on the inventory in question or be obliged to accept a smaller amount which, for aught the record shows, may or may not have resulted in a loss. It necessarily follows, therefore, that Columbus could not at any time in 1945 have *186 reasonably ascertained the amount of the loss, if any, that would be sustained. Hence, since the action of Columbus in writing down the value of its inventory, in effect, reflected the accrual of a loss sustained thereon, such action was improper. The next question calls for a determination by us of the proper treatment to be accorded the gains realized by petitioner, as an individual, from the five sales of war surplus piling. We are also asked to decide the proper year for the taxing thereof. Of the five sales in question, one was made in 1946 and the remaining four in 1947. Each sale was definite and complete. However, payments therefor were actually made to and received by the petitioner in 1947 and 1948. Petitioner contends that the materials so sold were capital assets within the definition contained in section 117 (a) (1), Internal Revenue Code, [1] and that any gain realized is therefore a capital gain. Petitioner further maintains that since he reports on a cash basis, such gains are to be taxed to him in 1947 and 1948, in which years the proceeds of the sales were actually received by him. *187 It is respondent's position that the gains in controversy constitute ordinary income taxable to petitioner in 1946 and 1947. He argues that, at the time of the sales involved, the piling sold was stock in trade held by petitioner primarily for sale to customers in the ordinary course of the business in which he was engaged, of buying and selling such material. Respondent further maintains that, since the piling was property of the type properly to be included in inventory, if on hand at the end of the taxable year, Reg. 111, Sec. 29.41-2 [2] makes mandatory the use of the accrual method of accounting; that the sales were properly accruable in 1946 and 1947; and that, therefore, the gains realized thereon are to be taxed in those years. Whether, at the time of sale, property is a capital asset held for investment or speculation *188 purposes or is property held primarily for sale in the ordinary course of trade or business is entirely a question of fact. From the numerous cases dealing with the question, there have evolved a number of well recognized criteria for the determination of this question. One of the most important factors to be considered is the frequency and continuity of sales, or sales related activity, as opposed to isolated transactions. Dunlap v. Oldham Lumber Co., 178 Fed. (2d) 781. As was said in Snell v. Commissioner, 97 Fed. (2d) 891, the term "business" as used in the statute "* * * notwithstanding disguise in spelling and pronunciation, means busyness; it implies that one is kept more or less busy, that the activity is an occupation. * * *." Thus, an occasional sale is not enough. Thompson Lumber Co., 43 B.T.A. 726. But, when the end is profit, very slight activity or "busyness" constitutes "doing business". Roney v. Commissioner, 67 Fed. (2d) 165, affirming 26 B.T.A. 1213, certiorari denied 290 U.S. 705. To be considered also are the proximity of sales to purchase, Harriss, Adm. v. Commissioner, 143 Fed. (2d) 279, *189 affirming 44 B.T.A. 999; the extent and substantiality thereof; Boomhower v. United States, 74 Fed. Supp. 997; the general history of the properties involved, including the method, the reasons for and the purpose of acquisition; W. T. Thrift, Sr., 15 T.C. 366; and the general conduct of the operation, Ehrman v. Commissioner, 120 Fed. (2d) 607. No one of the foregoing tests is determinative of the question. Rather, each case must be decided on its own peculiar facts in the light of all pertinent factors. W. T. Thrift, supra.Thus approached, the record supports respondent's determination with regard to profit realized by petitioner from his sale on December 23, 1946 to Ohio-Midland of the surplus piling acquired by him shortly before from the War Assets Administration. Testifying as to the Midland deal, petitioner stated: "At that time, I decided if we were going into the junk business to handle second-hand material, we would keep the partnership out. I would handle it myself and keep the partnership out because of the risk involved. I contacted a power company in southern Ohio. They needed some poles. I showed *190 them they could save money, and after negotiations, we made a deal." In our judgment, petitioner aptly described the initiation of a new activity and a new business. He decided to go into the business of buying and selling surplus pilings for profit. True, the Midland deal was his first sale and certain additional considerations entered into the subsequent dealings in surplus pilings, but the sale on December 23, 1946 marked the embarking into a new business for profit. This was soon followed by other activity in January and February 1947, with resulting sales to other parties. Which is to say, that we see no difference in principle or in controlling facts between the Midland deal and the deals subsequently entered into. They were all connected with petitioner's new business. The sale to Midland in 1946 was made in the ordinary course of such business and resulted in ordinary income. Since the piling thus sold was property of a kind properly to be included in inventory if on hand at the end of the taxable year, the income realized is properly accruable and taxable to petitioner Sharp in 1946. See Regulations 111, sec. 29.41-2, supra. Petitioner's activities in connection with the *191 sales in 1947 of the surplus piling originally acquired by Columbus for use on the so-called Michigan deal, presents a different facet of the same question. This piling was admittedly acquired by Columbus as stock in trade to be sold to a customer in the ordinary course of its business, and was, in fact, so sold. Moreover, it was property of a kind properly to be included in its inventory if on hand at the end of the taxable year. It was, therefore, not a capital asset to Columbus. By what procedure, then, was it converted into a capital asset in the hands of petitioner? When the material was found to be defective by the customer to whom Columbus had sold it, and not useful for its purposes, petitioner, feeling responsible for having caused Columbus to embark upon the transaction, wished to hold it harmless against loss. He, accordingly, took over the piling individually to try to salvage as much from it as he could. This action, as we see it, in effect, resulted merely in a substitution of petitioner for Columbus in an effort to dispose of the material and to minimize any loss thereon. Certainly petitioner could not be said to have been a customer of Columbus. His intention when *192 he embarked upon the salvage operation was clearly to do what Columbus otherwise would have done. The material was at all times held by him for sale to any purchaser who might be obtained either by him or Columbus. In fact, some of the sales involved were made by petitioner, directly or indirectly through the partnership, to customers actually obtained by Columbus. That these sales were in liquidation of unwanted goods is unimportant. Boomhower v. United States, supra; Ehrman v. Commissioner, supra. After consideration of all material facts and inferences, we are convinced that petitioner's salvage operation in fact constituted the carrying on of a business within the intendment of section 117 (a) (1), supra, in the ordinary course of which business the piling in question, being property of a kind properly to be included in inventory if on hand at the end of the taxable year, was held for sale to customers. This being true, the gains derived therefrom are taxable to petitioner as ordinary income in 1947, the year in which they became properly accruable. See Reg. 111, sec. 29.41-2, supra. There appears to be some controversy with regard to petitioner's *193 having deferred a portion of the sales price and cost of the material sold to South Central and Pennsylvania. However, no evidence as to this item appears in the record other than shown in our findings. On the basis thereof, respondent's determination with respect thereto is sustained. As for the other costs, such as finder's fees, incurred in connection with some of the sales involved, such costs clearly appear to have been a part of the cost of the goods so sold and should be treated as such. Decisions will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *↩
2. REG. 111, SEC. 29.41-2. Bases of computation and changes in accounting methods. - * * * in any case in which it is necessary to use an inventory, no method of accounting in regard to purchases and sales will correctly reflect income except an accrual method.* * *↩